'09 CIV 2097

Howard Kleinhendler (HK-5722)   Judge Hellerstein
Julian D. Schreibman (JS-1124)
WACHTEL & MASYR, LLP
110 East 59th Street
New York, New York 10022
(212) 909-9500

*Attorneys for Plaintiff*
*Pontifex Partners, LLC*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PONTIFEX PARTNERS, LLC,

                        Plaintiff,

              -against-

MILLENNIUM GLOBAL EMERGING CREDIT
FUND, L.P.; MILLENNIUM GLOBAL EMERGING
CREDIT GP LIMITED; CREDIT SUISSE (EUROPE)
LIMITED and MICHAEL BALBOA,

                    Defendants.

Civ. A. No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Pontifex Partners, LLC by its attorneys, Wachtel & Masyr, LLP, as and for its Complaint against defendants Millennium Global Emerging Credit Fund, L.P., Millennium Global Emerging Credit GP Limited, Credit Suisse Securities (Europe) Limited and Michael Balboa, alleges as follows:

## NATURE OF THE CASE

1.     This is a securities fraud action brought by Pontifex relating to its investment of $1.5 million that was fraudulently obtained by the defendants. The defendants, through outright lies and material omissions induced the plaintiff to purchase partnership interests in a limited

partnership that was on the brink of insolvency.  Moreover, instead of issuing limited partnership shares to Pontifex, the defendants converted Pontifex's money to their own use.

2.      By this action Pontifex is seeking the immediate return of $1.5 million that defendants wrongfully obtained and are wrongfully withholding from plaintiff, punitive damages and attorneys' fees.

**PARTIES**

3.      Plaintiff Pontifex Partners, LLC ("Pontifex") is a Delaware limited liability company, with its principal place of business in Northbrook, Illinois.

4.      Defendant Millennium Global Emerging Credit Fund, L.P. (the "Partnership") is a Delaware limited partnership organized on or about September 25, 2007, which upon information and belief regularly conducts business in New York County through offices at 75 Rockefeller Center, 18th Floor - Suite 1903, New York, New York 10019.  It operates as an unregistered, private investment partnership for the benefit of United States taxable investors. The Partnership invested all of its funds in a master fund, Millennium Global Emerging Credit Master Fund Limited (the "Master Fund").  Upon information and belief, the Master Fund operates from offices at 75 Rockefeller Center, 18th Floor - Suite 1903, New York, New York 10019.

5.      Defendant Millennium Global Emerging Credit GP Limited has an address at Sydney Van House, Admiral Park, St Peter Port, Guernsey, Channel Islands, GY1 2HU and is the general partner of the Partnership (the "General Partner").  Upon information and belief, the General Partner engaged in activities relevant to the claims asserted in this case, through the direction of Michal Balboa,  from offices at 75 Rockefeller Center, 18th Floor - Suite 1903, New York, New York 10019.

6.      Defendant Michael Balboa ("Balboa") is Managing Director of the Master Fund. He is a citizen of the United States and, upon information and belief, maintains a residence in New York County and regularly conducts business from offices at 75 Rockefeller Center, 18th Floor - Suite 1903, New York, New York 10019.

7.      Defendant Credit Suisse Securities (Europe) Limited (CSEL) is a corporation organized under the laws of the United Kingdom.  Its principal activities are the arranging of finance for clients in the international capital markets, the provision of financial advisory services and acting as a dealer in securities, derivatives and foreign exchange on a principal and agency basis.  Upon information and belief, CSSEL regularly conducts business at 11 Madison Avenue, New York, New York 10010, and has asserted a claim for funds that Pontifex deposited in the Bank of New York in Manhattan.

## JURISDICTION AND VENUE

8.      This court has federal question jurisdiction under 28 U.S.C. § 1331 because the complaint alleges violations of the federal securities laws and regulations, 15 U.S.C. § 78 and 17 C.F.R. § 240.10b-5.

9.      The court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the state law claims asserted because they have a common nucleus of operative facts and constitute a single case or controversy with the claims arising under the laws of the United States.

10.      Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391 because a substantial part of the property that is the subject of this action is situated in this district, and several defendants are aliens.

## FACTS COMMON TO ALL COUNTS

### I.       The Millennium Defendants Violated the Securities Laws

11.     Plaintiff Pontifex is an investment fund.

12.     In July 2008, in response to inquiries that Pontifex made to the Millennium Defendants, Pontifex was solicited to purchase shares of the Partnership. In connection with this solicitation, the Partnership, through its principals and agents Michael Balboa, Cindy Goodstein, Dianna Raedle and Karoline Molberg, sent information to Katrina Carder, Pontifex's agent, for the purpose of inducing Pontifex to purchase a limited partnership interest in the Partnership. These representatives of the Partnership made material misrepresentations and omissions in order to convince Pontifex to transfer money to the Partnership.

13.     On or about August 14, 2008, William Leavitt, Pontifex's president, met in London, England with defendant Michael Balboa, the Managing Director of the Master Fund and who also acted on behalf of the Partnership and the General Partner. Balboa controlled the affairs of not only the Master Fund but also the Partnership as the Partnership transferred all of its funds to the Master Fund through the General Partner. Balboa also controlled the General Partner.

14.     The purpose of the August 14, 2008 meeting was to discuss Pontifex's potential investment in the Partnership. Balboa represented that the Partnership and the Master Fund were financially strong and demonstrating solid performance. Balboa stated that the Master Fund was up 4% during the first two weeks of August, and that it was up 11% for 2008. Balboa's representations were false.

15.     Cindy Goodstein is a Director of Millennium Global Asset Management, LLC, a Manhattan-based entity from which Balboa managed the Millennium Defendants. On September

16, 2008, Ms. Goodstein stated to Pontifex, on behalf of the Millennium Defendants, that the Partnership's investments had increased in value by an estimated 4.4% during August 2008, and that the Partnership's mid-September estimates indicated that the Partnership's investments had already increased in value by 3.3% during September 2008.  Goodstein's representations were false.

16.     Pontifex's due diligence communications with the Partnership continued on a regular basis throughout the final two weeks of September, and, upon the instruction of the Millennium Defendants, on or about September 29, 2008, Pontifex wired $1,500,000 to account 890 0361 158 at the Bank of New York in New York City, which account was in the name of CSSEL in its capacity as prime broker for the Master Fund, for credit to the Master Fund on behalf of the Partnership (the "$1.5 Million Subscription Payment").  The purpose of the wire transfer was to purchase shares in the Partnership.

17.     The Millennium Defendants misrepresented and failed to disclose to Pontifex material facts necessary to Pontifex's investment decision and which a reasonable investor would have relied upon before purchasing securities.  Specifically:

    a. The Master Fund had been forced in September 2008 to change its investment strategy to reduce its number of short positions and increase its number of long positions.  The short positions provided a hedge against losses.  This change was disclosed to existing investors on September 22, 2008, but was not disclosed to Pontifex prior to Pontifex's decision to invest in the Partnership on or about September 29, 2008.  Prior to investing, Pontifex relied upon statements by the Millennium Defendants in certain promotional materials entitled "Millennium Global Emerging Credit Fund" that were

provided to Pontifex by Cindy Goodstein on or about August 5, 2008. One of the three "Distinctive Features" of the fund listed in those materials was "short side positions" which provided a hedge against losses. However, by the middle of September 2008, those hedging short positions were no longer available to the Master Fund.

b. The Master Fund's investment managers were having difficulties getting prices quoted from brokers with respect to many of the positions held by the Master Fund, which severely limited the Fund's liquidity. This was known to the Millennium Defendants prior to September 29, 2008, but not disclosed to Pontifex;

c. The Master Fund had been engaged in discussions with CSSEL regarding the Master Fund's collateral and margin terms, which were falling to dangerously low levels and which would necessitate a fresh capital infusion. These discussions began before Pontifex transferred its $1.5 Million Subscription Payment on September 29, 2008. The Partnership did not tell Pontifex about these discussions but instead misrepresented to Pontifex that the Partnership's investments were doing well.

18.    On October 2, 2008, Cindy Goodstein stated to Pontifex that the Partnership's investments had increased in September by an estimated 5%. This statement was false. Indeed, the Partnership's investments actually decreased in September 2008 by 12.5%. This false statement was made for the purpose of misleading Pontifex and to further induce Pontifex not to demand the immediate return of its $1.5 Million Subscription Payment. As of this date, no

Partnership shares had been issued to Pontifex and Pontifex was not a limited partner of the Partnership.

19.     On October 6, 2008, just six days after Pontifex sent its $1.5 Million Subscription Payment, CSSEL formally changed its collateral and margin terms with the Master Fund. According to statements made by the Master Fund and the Partnership during a conference call on October 14, 2008, CSSEL's changes in the collateral and margin terms dramatically affected the Master Fund's cash position which immediately went from a positive cash position to a negative cash position. This resulted in an inability on the part of the Master Fund to meet margin requirements. As of this date, no Partnership shares had been issued to Pontifex and Pontifex was not a limited partner of the Partnership.

20.     The Millennium Defendants' misrepresentations and omissions were material and made in connection with the purchase of securities. If Pontifex had been aware of the above facts, it would not have transferred the $1.5 Million Subscription Payment for purposes of investing in the Partnership.

## II.     Millennium Was Not Capable of Selling Partnership Shares to Pontifex When Pontifex Transmitted Its Subscription Payment

21.     On or about August 7, 2008, in connection with Pontifex's potential investment, the Millennium Defendants sent Pontifex a "Confidential Memorandum Relating to U.S. Dollar Interest of Millennium Global Emerging Credit Fund, L.P." (the "CM"). The CM was sent to Pontifex by Debbie Sebire, the Managing Director of Millennium Asset Management Limited, an affiliate and agent of the Millennium Defendants. Attached to the CM was Annex I, entitled "Millennium Global Emerging Credit Fund, L.P. Subscription Documents" (the CM and the Annex I are collectively referred to as the "Subscription Documents"). As set forth therein, to become a limited partner, Pontifex was required to contribute capital in the form of a

subscription payment and to submit executed Subscription Documents to the Partnership for approval.

22.     In addition, as set forth in the Subscription Documents, Pontifex could not become a limited partner until accepted as such by the General Partner acting on behalf of the Partnership.

23.     In or about September 2008, induced by the material misrepresentations of fact and omissions by the Millennium Defendants, Pontifex decided to purchase a limited partnership interest in the Partnership.

24.     On or about September 18, 2008, pursuant to the instructions set forth in the Subscription Documents, Pontifex completed and executed its Subscription Documents and sent them to the General Partner of the Partnership, c/o Argonout Limited, a company organized under the laws of Bermuda and designated to serve as the Administrator of the Partnership and the Master Fund (the "Administrator").

25.     The executed Subscription Documents formed a binding written contract between Pontifex and the Partnership.  However, Pontifex did not become a Limited Partner of the Partnership by executing the Subscription Documents.  Only upon the acceptance of Pontifex's subscription payment and the issuance of limited partnership shares to Pontifex could Pontifex become a Limited Partner of the Partnership.

26.     On October 1, 2008, the Administrator confirmed receipt of Pontifex's $1.5 Million Subscription Payment.

27.     Under the Subscription Agreement, until Pontifex's subscription payment was accepted and limited partnership interests were assigned to Pontifex, Pontifex's uninvested $1.5 Million Subscription Payment was to be held *by the Partnership* in a non-interest bearing

account.   Specifically, Section I(A) of the Subscription Agreement provides: "Subject to any legal or regulatory restrictions before the Closing Date, the Investor's payment (the "Payment") will be held by the Partnership in a non-interest bearing account."

28.     On information and belief, before accepting new Limited Partners, the Partnership had to complete a valuation of the Partnership.  Because the Partnership utilized a master-feeder structure to invest substantially all of its assets in the Master Fund, the valuation of the Partnership's assets and liabilities was generally based on the valuation of the shares of the Master Fund.  As set forth in the CM, that valuation was to be obtained on the last business day of each month on which banks in London, New York and Bermuda were all open for business.

29.     As set forth in the CM, new partners could be admitted to the Partnership only as of the first business day of each month. Therefore, the Partnership could not accept Pontifex's $1.5 Million Subscription Payment or issue any partnership interests to Pontifex until the Partnership completed its September 2008 month-end valuation.

30.     As of October 15, 2008, the Partnership had not completed its September 2008 month-end valuation and therefore could not have accepted Pontifex's $1.5 Million Subscription Payment for the October 1, 2008 investment period.

31.     On October 15, 2008, Pontifex sent the Partnership a written demand for the immediate return of its $1.5 Million Subscription Payment, along with wire transfer instructions.

32.     The Partnership did not respond.

33.     After the close of business on October 15, 2008, the directors of the Master Fund petitioned the Supreme Court of Bermuda for immediate appointment of joint provisional liquidators over the Master Fund.  The Master Fund has since stated publicly on October 17,

2008, that prior to October 15 it had been served with several notices of default, thereby triggering a cessation of trading activity and a lack of capital infusion.

34.     On October 16, 2008, the Supreme Court of Bermuda appointed joint provisional liquidators (the "JPL") to control the Master Fund.

35.     On October 17, 2008, the Millennium Defendants conducted a conference call with investors and persons who had made transfers of subscription payments, including Pontifex, disclosing the status of the Master Fund and revealing that the JPL had been appointed to control the Master Fund.  During that call, the JPL expressly confirmed that no net asset value of the fund had been determined for September 30, 2008.

36.     On information and belief, as of October 15, 2008, at the latest, no new investments could be made in the Master Fund.  Similarly, as of that date, no new limited partnership shares could be issued in the Partnership because the Partnership, as a dedicated feeder fund to the Master Fund, no longer had the ability to invest funds in accordance with its stated purpose.  As of October 15, 2008, the Partnership had not accepted Pontifex as a limited partner.  It had not issued any partnership interests to Pontifex or in Pontifex's name, nor had it established a net asset value for September 30, 2008 that would permit it to accept Pontifex's subscription payment or issue limited partnership interests to Pontifex.

37.     On October 20, 2008, Pontifex, through its counsel, issued a second demand for the immediate return of Pontifex's $1.5 Million Subscription Payment

38.     On October 28, 2008, the JPL of the Master Fund responded to Pontifex's October 20th demand, stating that it had authority to speak on behalf of the Partnership in respect to Pontifex's demand for return of its monies.  The JPL further stated: "We are currently investigating the issue relating to the subscriptions which were made to the Funds and in respect

of which no shares were issued.  Once we are in a position to do so we will provide you with substantive response to your letter."

39.    In response to its repeated demands for the return of its $1.5 Million Subscription Payment, Pontifex has learned that the account to which it transferred the $1.5 Million Subscription Payment was not a custodial or trust account, nor an account in the Partnership's name at all, but instead was a general account maintained by CSSEL at the Bank of New York.

40.    CSSEL acted as the prime broker for the Master Fund, and according to counsel for the joint provisional liquidators of the Master Fund, CSSEL has claimed and purported to exercise a security interest in all funds deposited into that account.  According to the Master Fund's joint provisional liquidators, CSSEL exercised its purported security rights over all monies contained in the account, including Pontifex's $1.5 Million Subscription Payment.

**III.    CSSEL Has No Right to Pontifex's $1.5 Million**

41.    The $1.5 Million Subscription Payment was transferred by Pontifex to the Partnership for the sole purpose of obtaining a limited partnership interest in the Partnership. The Partnership was required to hold the $1.5 Million Subscription Payment for Pontifex's sole benefit until a limited partnership interest was assigned to Pontifex.

42.    Until Pontifex was accepted as a limited partner of the Partnership and assigned limited partnership interests, its $1.5 Million Subscription Payment remained the property of Pontifex, and neither the Partnership nor the Master Fund had the right to make Pontifex's $1.5 Million Subscription Payment subject to the security interests of CSSEL or any other third party.

43.    Pontifex's $1.5 Million Subscription Payment was never invested in the Partnership, and Pontifex was never issued a limited partnership interest in the Partnership.

Because no limited partnership interest was ever issued to Pontifex, at no point did Pontifex surrender its title to the funds held by the Partnership.

44.    From October 15, 2008 through mid-January 2009, the Partnership continued to refuse Pontifex's demands for the return of the $1.5 Million Subscription Payment and it failed to provide any substantive response to Pontifex's demand.   Indeed, the Partnership did not respond at all to Pontifex.  The only responses Pontifex received came from the joint provisional liquidators of the Master Fund, who by their own admission had not been appointed in any capacity with respect to the Partnership.  No one from the Partnership or the General Partner responded to Pontifex's correspondence—correspondence that Pontifex and its counsel mailed to numerous representatives of the Partnership and the General Partner.

45.    Finally, on January 21, 2009, the Partnership provided a substantive response in the form of a letter from its counsel.  In that letter, the Partnership took numerous positions that were false and unsustainable.   Specifically, the Partnership took the position that Pontifex's September 29, 2008 $1.5 Million Subscription Payment had now—as of January 21, 2009—been deemed accepted by the Partnership; that the Partnership finally had established—as of January 21, 2009—a net asset value for October 1, 2008; that Pontifex could be awarded limited partnership interests based upon a belatedly-calculated  October 1, 2008 net asset value; and that the Partnership therefore was deeming Pontifex *retroactively* to be a Limited Partner, effective October 1, 2008.

46.    The positions taken by the Partnership in its January 21, 2009 letter are fabrications and attempts to exculpate the Partnership from liability for its failure to hold Pontifex's uninvested $1.5 Million Subscription Payment in trust for the benefit of Pontifex, and

its failure (or inability) to return Pontifex's monies when Pontifex demanded their return on October 15, 2008.

47.     On information and belief, at the time the Partnership issued its January 21, 2009 letter, the Partnership had already permitted CSSEL to seize Pontifex's monies pursuant to the unlawful security arrangement between the Partnership and CSSEL. Thus, CSSEL seized Pontifex's money long before the Partnership decided to declare, in a belated and self-serving statement, that Pontifex was being awarded limited partnership interests retroactive to October 1, 2008.

### FIRST CAUSE OF ACTION
**(Violation of 15 U.S.C. § 78j, 17 C.F.R. § 240.10b-5 Against Millennium Defendants)**

48.     Pontifex repeats and realleges the above paragraphs as though fully set forth herein.

49.     Between September 1, 2008 and September 30 2008, the Millennium Defendants made false and misleading representations to the plaintiff in order to induce the plaintiff to purchase securities – *i.e.*, a limited partnership interest in the Partnership.  The Millennium Defendants also made material omissions of fact when disclosure of such omitted facts was necessary to avoid misleading Pontifex.

50.     These false and misleading misstatements and material omissions include, among other things, the following:

> a.     The Millennium Defendants failed to disclose that the Master Fund had been forced in September 2008 to change its investment strategy to reduce its number of short positions, which hedged against losses, and increase its number of long positions.  This change was disclosed to existing investors on September 22, 2008, but was not disclosed to Pontifex prior to

Pontifex's decision to invest in the Partnership on or about September 29, 2008.

b.   The Millennium Defendants failed to disclose that the Master Fund's investment managers were having difficulties getting prices quoted from brokers with respect to many of the positions held by the Master Fund, which severely limited the Fund's liquidity.

c.   The Millennium Defendants failed to disclose that the Master Fund had been engaged in discussions with CSSEL regarding the Master Fund's collateral and margin terms, which were falling to dangerously low levels and which would necessitate a fresh capital infusion. These discussions began before Pontifex wire-transferred its $1.5 Million Subscription Payment on September 29, 2008.   Pontifex was not informed of these discussions; instead, the Millennium Defendants misrepresented to Pontifex that the Partnership's investments were doing well.

d.   The Millennium Defendants made false and misleading statements about the performance of the Master Fund.  Their statements throughout mid- and late-September that the Master Fund was up between 4% and 5% in September were misleading because the Millennium Defendants were in possession of facts that they knew would effect the performance of the Master Fund in an extremely negative way, and they knew that the performance estimates they communicated to Pontifex had not accounted for those facts.

     e.     On October 2, 2008, Cindy Goodstein, acting with the authority and on behalf of the Millennium Defendants, stated to Pontifex that the partnership's investments had increased in September by an estimated 5%. This statement was false.

51.    The defendants communicated these false and misleading misstatements to Pontifex with knowledge of their falsity and with the intent to deceive Pontifex and induce it to invest in the Partnership.

52.    Pontifex relied on the aforesaid false and misleading misrepresentations and because of them transferred the $1.5 Million Subscription Payment to an account in New York as directed by the Partnership's Administrator.  Pontifex would not have transferred this money had the Millennium Defendants not made the aforesaid false and misleading misrepresentations.

53.    Pontifex did not discover, nor could have discovered, any of the fraudulent misrepresentations or omissions set forth above before September 30, 2008.

54.    As a direct and proximate result of these defendants' conduct, Pontifex has sustained damages in an amount not less than $1.5 million, together with interest, legal fees and costs thereon as provided by law.

**SECOND CAUSE OF ACTION**
**(Conversion Against the Partnership and the General Partner)**

55.    Pontifex repeats and re-alleges the above paragraphs as though fully set forth herein.

56.    On or about September 29, 2008 Pontifex transferred the $1.5 Million Subscription Payment by wire into a CSSEL account, for the benefit of the Master Fund on behalf of the Partnership, at the Bank of New York, in New York City.

57.     The Partnership never completed its September 2008 month-end valuation and, pursuant to the CM, did not and could not accept the $1.5 Million Subscription Payment as a result.   Under the terms of the CM, the $1.5 Million Subscription Payment must be deemed rejected and as a consequence Pontifex has legal title and a lawful right to it under New York law.

58.     Upon rejection of the payment, Pontifex sent prompt written demand to the Partnership seeking its immediate return.

59.     The $1.5 Million Subscription Payment was not returned.

60.     Pontifex has maintained ownership over the $1.5 Million Subscription Payment at all times and has a possessory right to the payment that is superior to any possessory rights of the Partnership or any other person or entity.

61.     The Partnership has no legal, beneficial or equitable title to these funds.

62.     Pontifex is entitled to immediate possession of the $1.5 Million Subscription Payment.

63.     By refusing to return Pontifex's $1.5 Million Subscription Payment, the Partnership has wrongfully exercised dominion and control over Pontifex's property.

64.     By reason of the foregoing, Pontifex sustained damages in the amount of $1.5 million, plus all interest that has accrued from the date Pontifex demanded return of its money.

65.     The Defendants' actions were willful and contumacious and undertaken with the intent to harm plaintiff.   Punitive damages should be awarded in an amount to be determined at trial, but not less than $5 million.

### THIRD CAUSE OF ACTION
### (Conversion Against CSSEL)

66.     Pontifex repeats and re-alleges the above paragraphs as though fully set forth herein.

67.     The Partnership never completed its September 2008 month-end valuation and, pursuant to the CM, did not and could not accept the $1.5 Million Subscription Payment as a result.  Under the terms of the CM, the $1.5 Million Subscription Payment must be deemed rejected and as a consequence Pontifex has legal title and a lawful right to it under New York law.

68.     Upon rejection of the payment, Pontifex sent written demand to the Partnership seeking its immediate return.

69.     The $1.5 Million Subscription Payment was not returned.

70.     At some point after October 1, 2008, Defendant CSSEL wrongfully asserted a security interest over all funds in the New York account containing the $1.5 Million Subscription Payment, despite the fact that the $1.5 million contained in that account belongs to Pontifex.

71.     Regardless of CSSEL's agreements with the Master Fund, CSSEL cannot, by virtue of its agreements with the Master Fund, obtain a security interest in monies that the Master Fund does not own—monies that are unqualifiedly the property of Pontifex.

72.     Pontifex has maintained ownership over the $1.5 Million Subscription Payment at all times and has a possessory right to the payment that is superior to any possessory rights of CSSEL or any other person or entity.

73.     To date, CSSEL has not returned the money.  By refusing to return Pontifex's $1.5 Million Subscription Payment, CSSEL has wrongfully exercised dominion and control over Pontifex's property.

74.     By reason of the foregoing, Pontifex sustained damages in the amount of $1.5 million, plus all interest that has accrued from the date Pontifex demanded return of its money.

75.     The Defendants' actions were willful and contumacious and undertaken with the intent to harm plaintiff.  Punitive damages should be awarded in an amount to be determined at trial, but not less than $5 million.

## FOURTH CAUSE OF ACTION
### (Breach of Contract Against the Partnership and the General Partner)

76.     Pontifex repeats and re-alleges the above paragraphs as though fully set forth herein.

77.     On or about September 18, 2008, Pontifex and the Partnership entered into a valid and enforceable contract pursuant to the Subscription Documents.

78.     In accordance with the Subscription Documents, on or about September 29, 2008, Pontifex transferred the $1.5 Million Subscription Payment by wire to the account at the Bank of New York identified by the Partnership.

79.     On October 1, 2008, the Partnership, through its Administrator, acknowledged receipt of Pontifex's $1.5 million payment.

80.     Section I(B) of the Subscription Agreement provides:

> The Investor understands and agrees that the Partnership reserved the right to reject this subscription for an Interest for any reason or no reason, in whole or in part, and at any time prior to its acceptance.  *If the subscription is rejected, the Payment will be returned promptly to the Investor* and this subscription agreement (the "Subscription Agreement") shall have no force or effect….

Subscription Agreement, § I(B) (emphasis added).

81.     Section I(B) of the Subscription Agreement makes it clear that the Partnership has only two choices with respect to the $1.5 Million Subscription Payment received from Pontifex:

reject the subscription or accept it.  Pontifex's $1.5 Million Subscription Payment was not, and could not be, accepted.  If Pontifex's $1.5 Million Subscription Payment had been accepted, Pontifex would have become a Limited Partner under §1(B) of the Subscription Agreement, which states, "Upon acceptance of this subscription by the Partnership, Investor shall become a Limited Partner."

82.     No Limited Partnership interests were issued to Pontifex and, accordingly, Pontifex's subscription was rejected.

83.     Pontifex demanded the prompt return of its $1.5 million.

84.     Under §1(B) of the Subscription Agreement, the Partnership's rejection of Pontifex's subscription requires the Partnership to return Pontifex's subscription "promptly."  It has been more than four months since Pontifex demanded the return of its money, and the Partnership has breached its obligation to return Pontifex's monies promptly.

85.     The Subscription Documents prohibited the Partnership from transferring Pontifex's uninvested payment to any third party, including to the Master Fund or to CSSEL.

86.     The Partnership failed to return Pontifex's $1.5 million in breach of the Subscription Agreement.

87.     The Partnership failed to hold Pontifex's $1.5 Million Subscription Payment in a non-interest bearing account in breach of the Subscription Agreement.

88.     Upon information and belief, the Partnership transferred custody and control of the payment to CSSEL in violation of the Subscription Agreement.

89.     Pontifex has fully performed all of its obligations under the parties' contract.

90.     By reason of the Partnership's breach of the contract, Pontifex sustained damages in the amount of $1.5 million, plus interest from the date Pontifex demanded return of its money.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment Against Defendant CSSEL)

91.     Pontifex repeats and re-alleges the above paragraphs as though fully set forth herein.

92.     Pontifex has legal and equitable ownership of the $1.5 Million Subscription Payment.

93.     At no time did the Partnership or any other party disclose to Pontifex that Pontifex's wire-transferred subscription payment would be subject to a security interest of CSSEL or anyone else.

94.     Regardless of CSSEL's agreements with the Master Fund, CSSEL cannot, by virtue of its agreements with the Master Fund, obtain a security interest in monies that the Master Fund does not own—monies that are unqualifiedly the property of Pontifex.

95.     Defendant CSSEL has improperly exercised dominion and control over the $1.5 Million Subscription Payment to the detriment of Pontifex.

96.     Defendant CSSEL refuses to return the $1.5 million and has been unjustly enriched by such improper use or retention of Pontifex's monies.

97.     Equity requires Defendant CSSEL to return the $1.5 million to Pontifex

## SIXTH CAUSE OF ACTION
### (Constructive Trust Against All Defendants)

98.     Pontifex repeats and re-alleges the above paragraphs as though fully set forth herein.

99.     Pontifex is the legal and equitable owner of the $1.5 Million Subscription Payment. The Partnership took possession of the monies under circumstances that required it to hold Pontifex's uninvested $1.5 Million Subscription Payment for the benefit of Pontifex, and to

refrain from commingling those monies with the Partnership's funds or transferring Pontifex's monies to any affiliates or third parties, including but not limited to the Master Fund, or pledging Pontifex's monies to third parties, or subjecting those to the security interests of third parties such as CSSEL.

100.    The Partnership was and is obligated to segregate Pontifex's uninvested monies from the Partnership's assets and the assets of the Partnership's affiliates and investors.  Neither the Partnership nor its affiliates are entitled to use the monies to satisfy claims of other creditors or investors.

101.    Based on the circumstances under which the Partnership received Pontifex's $1.5 Million Subscription Payment, and based upon the express terms of the Subscription Agreement requiring the Partnership to hold Pontifex's uninvested funds in a special account, Pontifex is entitled to the imposition of a constructive trust over Pontifex's $1.5 million preventing the Partnership's transfer, disposition, or use of those monies, and requiring that they be segregated and held for Pontifex's benefit until they are returned to Pontifex.

102.    To the extent that CSSEL has taken possession of the $1.5 Million Subscription Payment or to the extent it has claimed a right to those monies as security for obligations owed to it by the Master Fund or other affiliates of the Partnership, CSSEL has done so in violation of Pontifex's sole ownership rights in those monies and in violation of the obligation of the Partnership to hold those monies in trust for the benefit of Pontifex.  CSSEL had no right to assert a security interest in funds that were not the property of the Master Fund but were instead solely the property of Pontifex.

## SEVENTH CAUSE OF ACTION

### (Declaratory Judgment Against All Defendants)

103.   Pontifex repeats and re-alleges the above paragraphs as though fully set forth herein.

104.   As set forth herein, Pontifex has a legitimate right, title and interest in the $1.5 Million Subscription Payment and is entitled to immediate return of such monies.

105.   There exists a justiciable controversy between Pontifex and the Defendants. Pontifex claims that it has a right to the immediate return of its monies.  The Partnership has failed and refused to return the monies.   CSSEL has purported to claim all the monies in satisfaction of obligations owed to it by the Partnership or the Partnership's affiliates.

106.   A justiciable controversy exists concerning the rights and obligations of the parties.

107.   By reason of the foregoing, the Court should declare the rights and obligations of the parties and the nature of the relief to which Pontifex may be entitled.

**WHEREFORE**, plaintiffs respectfully request that the Court enter judgment in its favor and against Defendants as follows:

(i)     on the first cause of action, damages against the Millennium Defendants, jointly and severally, in the amount of $1.5 million, together with interest, legal fees and costs thereon as provided by law;

(ii)    on the second cause of action, ordering the Partnership and the General Partner to return of Pontifex's $1.5 Million Subscription Payment plus interest from the date Pontifex demanded return of its money, plus punitive damages in an amount to be determined at trial, but not less than $5 million;

(iii)   on the third cause of action, ordering CSSEL to return Pontifex's $1.5 Million Subscription Payment plus interest from the date CSSEL exercised a purported security interest over the account containing Pontifex's money, plus punitive damages in an amount to be determined at trial, but not less than $5 million;

(iv)    on the fourth cause of action, damages against the Partnership and the General Partner in the amount of $1.5 million, plus interest from the date Pontifex demanded return of its money;

(v)     on the fifth cause of action, damages against CSSEL in the amount of $1.5 million, plus interest from the date CSSEL exercised a purported security interest over the account containing Pontifex's money;

(iv)    on the sixth cause of action, the imposition of a constructive trust over the $1.5 Million Subscription Payment;

(v)     on the seventh cause of action, a declaration of the rights and obligations of the parties and the nature of relief to which Pontifex may be entitled; and

(vi)    such other and further relief as this Court deems just and proper.

Plaintiff demands a trial by jury.

Dated: New York, New York
       March 4, 2009

                                           Howard Kleinhendler (HK-5712)
                                           Julian D. Schreibman (JS 1124)
                                           WACHTEL & MASYR, LLP
                                         110 East 59th Street
                                           New York, New York 10022
                                         (212) 909-9500

Of Counsel:
                                           *Attorneys for Plaintiff*
                                           *Pontifex Partners, LLC*

Phillip S. Reed
PATZIK, FRANK & SAMOTNY LTD.
150 South Wacker Drive - Suite 1500
Chicago, Illinois 60606
Tel. (312) 551-8300